JDN

WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| Robert Heath Shores, | No. CV 20-00759-PHX-DGC (CDB) |
|---|---|
| Plaintiff, | |
| vs. | **ORDER** |
| Centurion Incorporated, et al., | |
| Defendant. | |

Plaintiff Robert Heath Shores, who is confined at the Arizona State Prison Complex-Eyman in Florence, Arizona, brought this pro se civil rights action under 42 U.S.C. § 1983 against Centurion Health and Nurse Practitioner (NP) Siji Thomas. (Doc. 27.) Before the Court is Shores' Motion for Preliminary Injunction, which seeks emergency medical treatment for his prostate. (Doc. 11.) The Court will deny the Motion for Preliminary Injunction without prejudice.

**I.    Background**

In his First Amended Complaint, Shores alleged that he was, and continues to be, denied necessary medical care for a nodule on his prostate and worsening prostate-related pain and symptoms. (Doc. 27.) He named as Defendants NP Thomas and Centurion, the private company contracted to provide health care to prisoners in the Arizona Department of Corrections (ADC). (*Id.*) Shores stated that in 2018, while housed at a private prison facility, he underwent a pelvic ultrasound which revealed a nodule on his prostate, and the

provider ordered an endorectal ultrasound. (*Id.* at 3.) In May 2019, before he received the endorectal ultrasound, Shores was transferred to ASPC-Eyman, where he immediately sought medical treatment for his condition. (*Id.*) Shores saw Thomas in August 2019, and Thomas submitted a request for an endorectal ultrasound, but it was not preformed. (*Id.*) Shores alleged that he has continued to suffer severe prostate pain and his condition is worsening, that he has submitted written requests for medical care, and that attorneys have written letters on his behalf seeking necessary treatment, but Defendants have failed to treat or monitor his condition adequately or provide physician-ordered treatment. (*Id.* at 3–8.) Shores stated that due to Defendants' failure to treat his condition, he has had to have a Foley catheter placed with a leg bag, and he may require this device for the rest of his life. (*Id.* at 9.) In his request for relief, Shores sought money damages, declaratory relief, and injunctive relief in the form of necessary treatment from a cancer specialist. (*Id.* at 19–20.)

On June 12, 2020, Shores filed his Motion for Preliminary Injunction, in which he states that he finally saw a urologist on April 25, 2020. (Doc. 11 at 2.) Shores alleges that he has not received the follow-up treatment recommended by the urologist, that his symptoms and pain have worsened, and that he has since had to be fitted with a catheter, which causes pain. (*Id.* at 3–4.) He requests an order directing Centurion to send him to a cancer specialist. (*Id.* at 4.)

The Court ordered expedited briefing on the Motion. (Doc. 13.) After briefing was completed, the Court directed Defendants to file a Supplement to include Shores' most recent medical records. (Docs. 30, 33.)

**II.    Relevant Facts**

Shores is 35-year old man who has been in ADC custody since 2018. (Doc. 20-3 at 3.)[1]  He was initially housed at the Central Arizona Corrections Facility (CACF) in Florence, Arizona. (Doc. 11 at 1.) Medical records show that on August 30, 2018, Shores underwent a pelvic ultrasound, which revealed a 2.5 cm nodule on his prostate and bilateral

---

[1] *See* https://corrections.az.gov/public-resources/inmate-datasearch (search by prisoner number for "325025") (last visited July 17, 2020).

- 2 -

hydroceles. (*Id.*; Doc. 22 at 6–7, 12.)[2] On September 11, 2018, the treating provider, Dr. E. Thompson, entered orders for an endorectal ultrasound and for radiation and chemotherapy. (Doc. 22 at 6–7.)

On October 8, 2018, Dr. Thompson noted in the medical record that there was no specialty provider for an endorectal ultrasound available. Therefore, a request for a urology consult was made. (Doc. 22 at 11.)

In early May 2019, Shores was transferred from CACF to the ASPC-Eyman Cook Unit. (*Id.*) Shores immediately submitted a health needs request (HNR) advising medical of his condition and requesting that the medical unit assume treatment as ordered by Dr. Thompson. (*Id.*)

On August 26, 2019, Shores saw Thomas. (Doc. 20-2 at 2.) At this encounter, Shores reported pain in his testicles and everywhere in the genitals, he informed Thomas that he has a nodule in his testicle, and together they reviewed the medical records from CACF, including Dr. Thompson's Offsite Services Referral Requests for an endorectal ultrasound. (*Id.*; Doc. 22 at 1–2, 6–7.) Shores advised Thomas that the endorectal ultrasound had been ordered, but never done, and that the previous provider had recommended radiation and chemotherapy. (Doc. 20-2 at 2.) Shores also reported dribbling, pain when using the restroom, difficulty urinating, inability to empty his bladder, frequent urination, weight fluctuation, and worsening symptoms. (*Id.*) Thomas noted a small lump, less than .5 cm on the left testicle with no redness or swelling. (*Id.*) Thomas assessed "possible BPH [benign prostatic hyperplasia]/prostate cancer/epidydimal cyst/testicular cancer." (*Id.*) That same day, Thomas submitted a consult request for an ultrasound of the scrotum and an endorectal ultrasound of the prostate. (*Id.* at 2–3.)

---

[2] A hydrocele is a type of swelling in the scrotum that occurs when fluid collects in the thin sheath surrounding a testicle. *See Mayo Clinic Hydrocele*, http://www.mayoclinic.org/diseases-conditions/hydrocele/symptoms-causes/syc-20363969#:~:text=A%20hydrocele%20(HI%2Ddroe%2D,or%20injury%20within%20the%20scrotum (last visited July 17, 2020).

On September 18, 2019, attorney Thomas Nosewicz from the Prison Law Office, wrote a letter to the ADC's legal counsel regarding Shores' need for medical care because Shores was a class member in the ongoing *Parsons v. Ryan* class action lawsuit against ADC. (Doc. 22 at 14.) Mr. Nosewicz noted the August 26, 2019 medical record and consult requests for an endorectal ultrasound and an ultrasound of the scrotum and that the status for these two requests was still pending. (*Id.* at 14–15.) Mr. Nosewicz requested that Shores receive the diagnostic testing without further delay. (*Id.* at 15.)

On September 23, 2019, the consult request was authorized. (Doc. 20-2 at 4.)

The endorectal ultrasound was not performed. (Doc. 11 at 2.) But on September 28, 2019, Shores underwent an ultrasound of the scrotum, which showed no evidence of testicular mass or torsion and no evidence of epididymitis or orchitis, no left hydrocele, and a trace right hydrocele. (Doc. 20-2 at 5–6.)

On October 9, 2019, Shores saw Thomas, who informed Shores of the ultrasound results. (*Id.* at 7.) Shores reported scrotal discomfort and pain, for which Thomas prescribed Tylenol. (*Id.* at 7–8.)

On November 5, 2019, Shores submitted an HNR reporting significant prostate pain that prevented him from sleeping or attending classes. (Doc. 11 at 2.) The HNR response informed Shores that he was scheduled to see a provider on November 15, 2019. (*Id.*) Shores was not seen on November 15, 2019. (*Id.*; Doc. 22 at 2.)

On December 3, 2019, attorney Corene Kendrick from the Prison Law Office wrote a letter on Shores' behalf to ADC's legal counsel, noting Shores' November 5, 2019 request for medical care and requesting that Shores be seen as soon as possible for his symptoms. (Doc. 22 at 16.)

On December 6, 2019, Shores saw Thomas. (*Id.* at 18; Doc. 11 at 2.)[3] During this encounter, Thomas called the clinical coordinator, Terri Espinosa, on speaker phone regarding the scheduled endorectal ultrasound. (Doc. 11 at 2.) Espinosa stated that the

---

[3] Thomas did not submit the medical record from the December 6, 2019 encounter. (*See* Doc. 20.)

- 4 -

endorectal ultrasound had been scheduled at "M.M.G.," but M.M.G could not perform the procedure. (*Id.*) Espinosa stated that she would schedule the procedure with Banner Health. (*Id.*)

On December 19, 2019, attorney Mr. Nosewicz wrote another letter on Shores' behalf to ADC's legal counsel. (Doc. 22 at 17.) Mr. Nosewicz wrote that this was the third letter detailing delays in care regarding the nodule on Shores' prostate. (*Id.*) Mr. Nosewicz noted that an endorectal ultrasound, which was requested on August 26, 2019, had not yet been scheduled, and he requested that Shores receive the procedure without further delay. (*Id.* at 18–19.)

On January 24, 2020, Shores saw Thomas. Shores reported difficulty urinating, dribbling, no urine stream, and an inability to empty his bladder. (Doc. 20-2 at 9.) Shores also reported a 10-pound weight loss in the last month and weight fluctuation, and he stated he was diagnosed with a nodular prostate in October 2018. (*Id.*) At this appointment, Shores' weight was 161 pounds. (*Id.*) Thomas noted that a TRUS (transrectal ultrasound) was ordered in August 2019, but had not yet been done. (*Id.*) Thomas assessed possible prostate cancer/prostate hypertrophy. (*Id.*) That same day, Thomas submitted a urology consult request for evaluation and management. (*Id.* at 10.)

Shores saw Thomas again on January 29, 2020, and reported increased scrotal pain. (*Id.* at 11.) Thomas noted mild tenderness on palpation of the left testicle, but no obvious enlargement of scrotum or lump or mass. (*Id.*) Thomas informed Shores that the urology consult request was under review. (*Id.*) Thomas documented that she notified the clinical coordinator to expedite the urology consult. (*Id.* at 12.)

On January 31, 2020, the urology consult was approved. (*Id.* at 13.) The form documenting scheduling of the urology appointment noted that the first available appointment was April 25, 2020. (Doc. 20-3 at 1.)

On March 4, 2020, attorney Rita Lomio with the Prison Law Office wrote a letter on Shores' behalf to ADC's legal counsel. (Doc. 22 at 20.) Ms. Lomio noted that on January 24, 2020, the provider submitted an urgent urology consult request, which was

approved on January 31, 2020, but the appointment had still not been scheduled. (*Id.*) Ms. Lomio requested that Shores' urology consult be scheduled without further delay. (*Id.* at 21.)

On April 25, 2020, Shores saw urologist Dr. Peter Niemczyk, who completed a medical history and exam which revealed a tender and boggy prostate, suggesting acute prostatitis. (Doc. 20-3 at 3–6.)[4] Dr. Niemczyk also noted that, given Shores' young age, he may have urethral stricture. (*Id.* at 6.) At this appointment, Shores was told that Centurion had not sent any medical records or lab results, and that Centurion had only requested a consult, not an endorectal ultrasound. (Doc. 11 at 3.) Dr. Niemczyk recommended a transrectal ultrasound, and he ordered an evaluation with PSA (prostate-specific antigen blood test). (Doc. 20-3 at 6–7; Doc. 20-4 at 1.) Dr. Niemczyk directed Shores to return in two weeks with a full bladder for testing, and requested that Shores return with copies of images and reports from prior prostate ultrasounds. (Doc. 20-3 at 6; Doc. 11 at 3.)

On April 27, 2020, Thomas submitted a consult request for urology follow up as recommended by the specialist. (Doc. 20-4 at 2.) On May 22, 2020, the consult request was authorized. (*Id.* at 2, 15.)

Meanwhile, around 11:30 p.m. on April 30, 2020, Shores reported to medical and saw a nurse. He stated that he was unable to urinate, he could only dribble, and he wanted to be seen. (*Id.* a 3.) Shores' vitals were taken, and his weight was documented at 145 pounds. (*Id.*) Shores spoke with the nurse about getting catheterized, and the nurse informed him that if he was in great pain, an order for catheterization could be obtained from the provider. (*Id.*) Shores feared that catheterization would cause more damage, and

---

[4] Prostatitis is swelling and inflammation of the prostate gland and often causes painful or difficult urination and pain in the groin, pelvic area, or genitals. Acute bacterial prostatitis is often caused by common strains of bacteria. *See Mayo Clinic Prostatitis*, https://www.mayoclinic.org/diseases-conditions/prostatitis/symptoms-causes/ syc-20355766#:~:text=Prostatitis%20is%20a%20disease%20of,urine%20leak%20into %20your%20prostate (last visited July 17, 2020).

he wanted to see medical in the morning when the provider was available. (*Id.*) Shores was scheduled to be seen in the morning. (*Id.* at 5.)

Shores reported to medical the next morning, May 1, 2020, around 9:00 a.m., and stated that he could not urinate and it had been 16 hours since he last urinated. (*Id.* at 7.) The medical record documented that Shores refused the straight catheter. (*Id.* at 7, 9.)

But at that May 1, 2020 encounter, Nurse D. Griffin conducted a straight catheter (single use catheter that is then thrown away) and drained 420 cc of urine. (Doc. 11 at 3.) Shores was advised to return to medical that evening if he was still unable to pass urine. (*Id.*) Shores returned to medical at 6:00 p.m., and he was still unable to pass urine. (*Id.*) Nurse Griffin submitted a request to Thomas to place a Foley catheter (an indwelling catheter that is left in place) on Shores. (*Id.*) Thomas denied the request for a Foley catheter and advised that Shores wait another 12 hours before placing a Foley catheter. (*Id.* at 4.) Nurse Griffin then consulted the Director of Nursing, who directed Griffin to call a different provider. (*Id.*) Nurse Griffin called NP Homestead, who authorized a Foley, and the Foley catheter was placed. (*Id.*) Upon catheterization, approximately 900 cc of urine was drained from Shores' bladder. (*Id.*)[5]

The next day, May 2, 2020, a nurse conducted a catheter check. (Doc. 20-4 at 11.) Shores reported some discomfort at night, but his urine was clear and amber, and the Foley catheter was secure. (*Id.*)

On June 1, 2020, an entry in the medical record regarding the urology appointment stated "service suspended see State of Arizona Executive Order 2020-10." (*Id.* at 16.)

On June 10, 2020, the urology appointment with Dr. Niemczyk was rescheduled for June 20, 2020. (*Id.* at 17.) Meanwhile, by this time, Shores had had the same Foley catheter in for over a month, causing severe pain. (Doc. 11 at 4.)

---

[5] Thomas did not provide the medical records documenting the May 1, 2020 morning straight catheter procedure or the evening placement of the Foley catheter. (*See* Doc. 20.)

On June 25, 2020, the appointment with Dr. Niemczyk was rescheduled to a date in July 2020.  (Doc. 20-4 at 18 (day of appointment is redacted).)

As of mid-July 2020, Shores had not yet seen Dr. Niemczyk, and he had incurred multiple, severely painful infections caused by the catheter.  (Doc. 22 at 4.)[6]

On July 14, 2020, Shores submitted an HNR stating that his catheter was not draining, and his bladder felt full of urine after he drinks.  (Doc. 33-1 at 1.)

On July 18, 2020, Shore saw Dr. Niemczyk for a transrectal ultrasound and examination.  (Doc. 33-1 at 12.)  The ultrasound showed no nodules.  (*Id.* at 13.)  Dr. Niemczyk ruled out urethra stricture, and he determined that acute prostatitis was unlikely.  (*Id.*)  Dr. Niemczyk assessed that Shores' sensation that there is an obstruction to his urine flow is most likely dysfunctional voiding, the cause of which may be elicited via urodynamics testing.  (*Id.*)  Dr. Niemczyk recommended that Shores be scheduled for the testing and that Shores may benefit from a trial of diazepam or lorazepam to relax his pelvic muscles.  (*Id.*)  Dr. Niemczyk ordered follow up in two weeks, and, on a separate Centurion form documenting the encounter, he noted that follow up was needed and urodynamics testing was "<u>urgent</u> so that pt. [patient] can be catheter free."  (*Id.* at 10.)

On July 21, 2020, Shores saw Thomas for follow up to the urology appointment and in response to the HNR about Shores' difficulty with the catheter draining.  (*Id.* at 1.)  Thomas noted that he could not locate the medical records from the July 18 appointment with Dr. Niemczyk.  (*Id.*)  Thomas wrote in the plan notes that as long as Shores could keep the bladder empty by forcing to void, he recommended that Shores keep the same catheter until Shores saw the urologist again.  (*Id.* at 4.)  That same day, Thomas submitted an urgent consult request for a urology appointment "for possible UDS [urodynamics] as recommended by urology."  (*Id.* at 6.)

---

[6] Thomas asserts that Shores had a Foley catheter change on July 2, 2020, but there is no July 2, 2020 medical record submitted.  (Doc. 20 at 5.)

- 8 -

On July 23, 2020, the urology consult request was authorized. (*Id.* at 7.) On July 29, 2020, the appointment with Dr. Niemczyk was scheduled for a date in August 2020. (*Id.* at 8 (day of appointment is redacted).)

**III.     Preliminary Injunction**

    **A.     Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this "serious questions" version of the sliding-scale test, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

The movant "has the burden of proof on each element of the test." *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000). Further, there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff." *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

When considering whether injunctive relief is warranted, a court may consider evidence or developments that postdate the pleadings. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). A court's factual findings and legal conclusions in a ruling on a motion for preliminary injunction are not binding at trial on the merits. *Camenisch*, 451 U.S. at 395.

### B. Discussion

#### 1. Serious Questions Going to the Merits

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Deliberate indifference may be shown when prison officials "deny, delay or intentionally interfere with medical treatment[,]" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990), or where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. Prison officials may also be deliberately indifferent if they fail to follow the recommendations of treating specialists. *See Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999).

Shores' allegations and medical records show that his prostate pain and symptoms constitute a serious medical need.

The medical records demonstrate that an endorectal ultrasound originally ordered by Dr. Thompson in September 2018, and then ordered again by Thomas in August 2019, was not performed until July 18, 2020. (Docs. 22 at 6–7; Doc. 22-2 at 2–3; Doc. 33-1 at 12.) The records also show that a urology consult request was not submitted until January 2020, despite Shores' ongoing pain and symptoms, and Shores did not see the urologist pursuant to that request until April 25, 2020. (Doc. 20-3 at 3.) Even though the urologist directed Shores to return for follow up two weeks after that April 25 appointment, Shores did not see the urologist again until July 18, 2020. (*Id.* at 3–6; Doc. 33-1 at 12.) This evidence supports that medical care in response to Shores' pain and serious symptoms and in response to physician and specialist-ordered treatment has been repeatedly delayed.

Thomas's argument that the unavoidable pandemic situation has caused the delays is not accurate. (Doc. 20 at 8.) The State's Executive Order halting nonessential procedures was issued on March 19, 2020, and lifted on April 22, 2020, allowing such procedures to resume May 1, 2020.[7] Thus, the pandemic-related Executive Orders affecting medical offices does not account for the delays in treatment in 2019 and early 2020, nor do they excuse the failure to provide the follow up ordered after the April 25, 2020 appointment.

Thomas argues that the delay in providing the endorectal ultrasound, which was ordered in August 2019, was due to hospital facilities not being able to accommodate that procedure. (*Id.*) Although Thomas claims that numerous attempts were made to schedule the procedure, he submits no medical record evidence to support this assertion. (Doc. 20, Ex. A, Thomas Decl. ¶ 10).[8] Even if such attempts were made, there is no explanation

---

[7] *See State of Arizona Executive Orders 2020-10 & 2020-32*, April 22, 2020, https://azgovernor.gov/sites/default/files/eo_2020-10.pdf, and https://azgovernor.gov/sites/default/files/eo_2020-32_elective_surgeries.pdf (last visited July 20, 2020).

[8] In his declaration, Thomas refers to a medical record dated October 4, 2019, to support that numerous attempts were made to schedule the procedure. (Doc. 20, Ex. A, Thomas Decl. ¶ 10 (Doc. 20-1 at 2–3).) But there is no citation to where in the attached medical records the October 4, 2019 record can be found, and the Court finds no record for that date. (*See id.*)

why, in light of the inability to schedule the procedure, the alternative treatment—a urology consult—did not occur until eight months later. (*See id.*) Shores alleges, and the medical records support, that these delays have caused worsening pain and catherization.

On this record, at the least, there are serious questions whether Centurion has denied and delayed necessary physician and specialist-ordered treatment and whether these delays are medically unacceptable under the circumstances. *See Alliance for the Wild Rockies*, 632 F.3d at 1135 (under the sliding-scale test, a court may issue a preliminary injunction if the plaintiff demonstrates "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff"); *see also Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) ("[s]erious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits") (internal quotation omitted).

### 2. Irreparable Harm

Shores must also demonstrate that absent an injunction, he will be exposed to irreparable harm. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (speculative injury is not irreparable injury sufficient for a preliminary injunction); *see Winter*, 555 U.S. at 22. To support a mandatory preliminary injunction for specific medical treatment, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury. *See Conn. v. Mass.*, 282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or presently threatened injuries"); *Caribbean Marine*, 844 F.2d at 674. "[T]here must be a presently existing threat of harm, although injury need not be certain to occur." *Villaneuva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal. Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–80 (9th Cir. 1997)). Pain can constitute irreparable harm. *See Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed and/or complete lack of necessary treatment, and increased pain); *Von Collin v. Cnty. of Ventura*, 189 F.R.D. 583, 598 (C.D. Cal. 1989) ("Defendants do not argue that pain and suffering is not irreparable harm, nor could they").

The recent medical records submitted by Defendants show that Shores saw Dr. Niemczyk on July 18, 2020. (Doc. 33-1 at 12–13.) This appointment with a urologist is essentially the relief Shores sought in his Motion for Preliminary Injunction. *See Farmer*, 511 U.S. at 846. Consequently, the request for injunctive relief is moot. The Court will therefore deny Shores' Motion for Preliminary Injunction without prejudice to refiling.

The medical records reflect that the recommended follow-up appointment has been scheduled for a date in August 2020. (Doc. 33-1 at 8.) The Court expects that if this follow up does not occur as represented by Defendants, or if Defendants do not provide the treatment and medication recommended by Dr. Niemczyk at this appointment, Shores will notify the Court and immediately renew his Motion for Preliminary Injunction.

**IT IS ORDERED** that the reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Preliminary Injunction (Doc. 11), and the Motion is **denied without prejudice**.

Dated this 13th day of August, 2020.

David G. Campbell
Senior United States District Judge