JDN

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Robert Heath Shores, | No.  CV  20-00759-PHX-DGC (CDB) |
| Plaintiff, | |
| vs. | **ORDER** |
| Centurion Incorporated, et al., | |
| Defendants. | |

Plaintiff Robert Heath Shores, who is confined at the Arizona State Prison Complex-Eyman in Florence, Arizona, brought this pro se civil rights action under 42 U.S.C. § 1983 against Centurion Incorporated and Nurse Practitioner (NP) Siji Thomas.  (Doc. 27.) Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 99.)[1]  The Court will deny the Motion.

I.    **Background**

In his First Amended Complaint, Shores asserted Eighth Amendment medical care claims.  (Doc. 27.)  Shores alleged that Defendants have failed to adequately treat or monitor his prostate condition or provide physician-ordered treatment, and, as a result, he has had to have a Foley catheter placed with a leg bag.  (Doc. 27 at 3–9.)  Shores sought declaratory and injunctive relief, and damages.  (*Id.* at 19–20.)

---

[1] Also before the Court is Shores' Motion for Preliminary Injunction (Doc. 143), which was filed on December 27, 2021 and is not yet fully briefed.

Defendants move for summary judgment on the grounds that (1) Shores cannot demonstrate deliberate indifference, (2) Shores has not suffered any injury attributable to Defendants, (3) injunctive relief is not warranted or is moot, (4) Shores has not shown that a current Centurion policy or custom caused a constitutional violation, and (5) punitive damages are not supported.  (Doc. 99.)[2]

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire*, 210 F.3d at 1102–03.  But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968), but it must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

---

[2] Upon the filing of Defendants' Motion for Summary Judgment, the Court issued an Order with the Notice required under *Rand v. Rowland*, 154 F.3d 952, 960 (9th Cir. 1998) (en banc), which informed Shores of the requirements under Federal Rule of Civil Procedure 56 and set a briefing schedule.  (Doc. 101.)

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Where the nonmovant is a pro se litigant, the court must consider as evidence in opposition to summary judgment all of the nonmovant's contentions set forth in a verified complaint or motion. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

## III.    Relevant Facts[3]

Shores is 36-year-old man who has been in ADC custody since 2018. (Doc. 20-3 at 3.)[4] He was initially housed at the Central Arizona Corrections Facility (CACF) in

---

[3] In their Reply, Defendants argue that Shores failed to file a separate statement of facts as required under Local Rule of Civil Procedure 56.1(b). (Doc. 123 at 2.) Within his Response, Shores included both a Memorandum and a Statement of Facts that responds to each of Defendants' asserted factual statements and indicates whether or not he disputes each asserted fact. (Doc. 111.) Thus, Shores complied with the Local Rule.

Defendants also argue generally that the evidence attached to Shores' Response is inadmissible because it constitutes duplicative medical records already attached to Defendants' Motion, inadmissible hearsay letters, and 2018 medical records not previously disclosed. (Doc. 123 at 2.) They further argue that Shores' declaration is not entirely supported by personal knowledge. (*Id.*) Initially, to the extent that Defendants object to any of Shores' evidence, they fail to cite to the particular part of the record to which they object, and they fail to provide any specific objection to identified paragraphs within Shores' declaration. (*See id.*) Their general assertion that evidence is hearsay or is unsupported is insufficient. *See Reinlasoder v. City of Colstrip*, CV-12-107-BLG, 2013 WL 6048913, at *7 (D. Mont. Nov. 14, 2013) (unpublished) ("objections [ ] must be stated with enough particularity to permit the Court to rule"); *see also Halebian v. Berv*, 869 F. Supp. 2d 420, 443 n.24 (S.D.N.Y. 2012) ("unsupported objection in entirely conclusory fashion to the entire record is insufficient and thus denied"). Moreover, there is no legal basis to exclude evidence attached to Shores' Response because the same evidence was submitted by Defendants. The letters to which Defendants refer are letters from the Prison Law Office regarding Shores' medical treatment. (Doc. 111 at 29–36.) The letters are on business letterhead and are self-authenticating, and they were sent to ADC counsel in the regular course of business. *See* Fed. R. Evid. 802(6); Fed. R. Evid. 901(b)(4). Lastly, the 2018 medical records submitted by Shores are relevant and they were previously disclosed in this litigation. (*See* Doc. 20 at 6–12.)

[4] *See* https://corrections.az.gov/public-resources/inmate-datasearch (search by prisoner number for "325025") (last visited Dec. 28, 2021).

Florence, Arizona.  (Doc. 11 at 1.)  Medical records show that on August 30, 2018, Shores underwent a pelvic ultrasound which revealed a 2.5 cm nodule on his prostate and bilateral hydroceles.  (*Id.*; Doc. 22 at 6–7, 12.)[5]  On September 11, 2018, the treating provider, Dr. E. Thompson, entered orders for an endorectal ultrasound and for radiation and chemotherapy.  (Doc. 22 at 6–7.)

On October 8, 2018, Dr. Thompson noted in the medical record that there was no specialty provider for an endorectal ultrasound available.  (Doc. 22 at 11.)  Therefore, a request for a urology consult was made.  (*Id.*)

In early May 2019, Shores was transferred from CACF to the ASPC-Eyman Cook Unit.  (*Id.*)  Shores immediately submitted a health needs request (HNR) advising medical of his condition and requesting that the medical unit assume treatment as ordered by Dr. Thompson.  (*Id.*)

On July 1, 2019, Centurion took over the healthcare at ASPC-Eyman.  (Doc. 100 ¶ 6.)

On August 26, 2019, Shores saw NP Thomas.  (Doc. 20-2 at 2.)  At this encounter, Shores reported pain in his testicles and everywhere in the genitals, he informed NP Thomas that he had a nodule in his testicle, and together they reviewed the medical records from CACF, including Dr. Thompson's Offsite Services Referral Requests for an endorectal ultrasound.  (*Id.*; Doc. 22 at 1–2, 6–7.)  Shores advised NP Thomas that the endorectal ultrasound had been ordered, but never done, and that the previous provider had recommended radiation and chemotherapy.  (Doc. 20-2 at 2.)  Shores also reported dribbling, pain when using the restroom, difficulty urinating, inability to empty his bladder, frequent urination, weight fluctuation, and worsening symptoms.  (*Id.*)  NP Thomas noted a small lump, less than 0.5 cm on the left testicle with no redness or swelling.  (*Id.*)  NP

---

[5] A hydrocele is a type of swelling in the scrotum that occurs when fluid collects in the thin sheath surrounding a testicle.  *See Mayo Clinic Hydrocele*, http://www.mayoclinic.org/diseases-conditions/hydrocele/symptoms-causes/syc-20363969#:~:text =A%20hydrocele%20(HI%2Ddroe%2D,or%20injury%20within%20the%20scrotum (last visited Dec. 27, 2021).

Thomas assessed "possible BPH [benign prostatic hyperplasia]/prostate cancer/epidydimal cyst/testicular cancer." (*Id.*) That same day, NP Thomas submitted a consult request for an ultrasound of the scrotum and an endorectal ultrasound of the prostate. (*Id.* at 2–3.)

On September 18, 2019, attorney Thomas Nosewicz from the Prison Law Office wrote a letter to the ADC's legal counsel regarding Shores' need for medical care because Shores was a class member in the ongoing *Parsons v. Ryan* class action lawsuit against ADC. (Doc. 22 at 14.) Mr. Nosewicz noted the August 26, 2019 medical record and consult requests for an endorectal ultrasound and an ultrasound of the scrotum and that the status for these two requests was still pending. (*Id.* at 14–15.) Mr. Nosewicz requested that Shores receive the diagnostic testing without further delay. (*Id.* at 15.)

On September 23, 2019, the consult request for the ultrasound procedures was authorized. (Doc. 20-2 at 4.)

On September 28, 2019, Shores underwent an ultrasound of the scrotum which showed no evidence of testicular mass or torsion and no evidence of epididymitis or orchitis, no left hydrocele, and a trace right hydrocele. (*Id.* at 5–6.) The endorectal ultrasound was not performed. (Doc. 11 at 2.)

On October 9, 2019, Shores saw NP Thomas, who informed Shores of the scrotum ultrasound results. (*Id.* at 7.) Shores reported scrotal discomfort and pain, and NP Thomas prescribed Tylenol. (*Id.* at 7–8.)

On November 5, 2019, Shores submitted an HNR reporting significant prostate pain that prevented him from sleeping or attending classes. (Doc. 11 at 2.) The HNR response informed Shores that he was scheduled to see a provider on November 15, 2019. (*Id.*)

Shores was not seen on November 15, 2019. (*Id.*; Doc. 22 at 2.)

On December 3, 2019, attorney Corene Kendrick from the Prison Law Office wrote a letter on Shores' behalf to ADC's legal counsel noting Shores' November 5, 2019 request for medical care and requesting that Shores be seen as soon as possible for his symptoms. (Doc. 22 at 16.)

On December 6, 2019, Shores saw NP Thomas. (*Id.* at 18; Doc. 11 at 2.)[6] During this encounter, NP Thomas called the clinical coordinator, Terri Espinosa, on speaker phone regarding the scheduled endorectal ultrasound. (Doc. 11 at 2.) Espinosa stated that the endorectal ultrasound had been scheduled at "M.M.G.," but M.M.G could not perform the procedure. (*Id.*) Espinosa stated that she would schedule the procedure with Banner Health. (*Id.*)

On December 19, 2019, attorney Mr. Nosewicz wrote another letter on Shores' behalf to ADC's legal counsel. (Doc. 22 at 17.) Mr. Nosewicz wrote that this was the third letter detailing delays in care regarding the nodule on Shores' prostate. (*Id.*) Mr. Nosewicz noted that an endorectal ultrasound was requested on August 26, 2019 and had not yet been scheduled, and he requested that Shores receive the procedure without further delay. (*Id.* at 18–19.)

On January 24, 2020, Shores saw NP Thomas. (Doc. 20-2 at 9.) Shores reported difficulty urinating, dribbling, no urine stream, and an inability to empty his bladder. (*Id.*) Shores also reported a 10-pound weight loss in the last month and weight fluctuation, and stated that he was diagnosed with a nodular prostate in October 2018. (*Id.*) At this appointment, Shores' weight was 161 pounds. (*Id.*) NP Thomas noted that a transrectal ultrasound was ordered in August 2019 but had not yet been done. (*Id.*) NP Thomas assessed possible prostate cancer/prostate hypertrophy. (*Id.*) That same day, NP Thomas submitted a urology consult request for evaluation and management. (*Id.* at 10.)

Shores saw NP Thomas again on January 29, 2020, and he reported increased scrotal pain. (*Id.* at 11.) NP Thomas noted mild tenderness on palpation of the left testicle but no obvious enlargement of scrotum or lump or mass. (*Id.*) NP Thomas informed Shores that the urology consult request was under review. (*Id.*) NP Thomas documented that she notified the clinical coordinator to expedite the urology consult. (*Id.* at 12.)

---

[6] Defendants did not submit the medical record from the December 6, 2019 encounter. (*See* Docs. 20, 100.)

On January 31, 2020, the urology consult was approved. (*Id.* at 13.) The form documenting scheduling of the urology appointment noted that the first available appointment was April 25, 2020. (Doc. 20-3 at 1.)

On March 4, 2020, attorney Rita Lomio with the Prison Law Office wrote a letter on Shores' behalf to ADC's legal counsel. (Doc. 22 at 20.) Ms. Lomio noted that on January 24, 2020, the provider submitted an urgent urology consult request, which was approved on January 31, 2020, but the appointment had still not been scheduled or completed. (*Id.*) Ms. Lomio requested that Shores' urology consult be scheduled without further delay. (*Id.* at 21.)

On April 25, 2020, Shores saw urologist Dr. Peter Niemczyk, who completed a medical history and exam which revealed a tender and boggy prostate, suggesting acute prostatitis. (Doc. 20-3 at 3–6.)[7] Dr. Niemczyk also noted that, given Shores' young age, he may have urethral stricture. (*Id.* at 6.)[8] At this appointment, Shores was told that Centurion had not sent any medical records or lab results and that Centurion had only requested a consult, not an endorectal ultrasound. (Doc. 11 at 3.) Dr. Niemczyk recommended a transrectal ultrasound and ordered an evaluation with PSA (prostate-specific antigen blood test). (Doc. 20-3 at 6–7; Doc. 20-4 at 1.) Dr. Niemczyk directed Shores to return in two weeks with a full bladder for testing, and requested that Shores return with copies of images and reports from prior prostate ultrasounds. (Doc. 20-3 at 6; Doc. 11 at 3.)

---

[7] Prostatitis is swelling and inflammation of the prostate gland and often causes painful or difficult urination and pain in the groin, pelvic area, or genitals. Acute bacterial prostatitis is often caused by common strains of bacteria. *See Mayo Clinic Prostatitis*, https://www.mayoclinic.org/diseases-conditions/prostatitis/symptoms-causes/syc-20355766#:~:text=Prostatitis%20is%20a%20disease%20of,urine%20leak%20into%20your%20prostate (last visited Dec. 27, 2021).

[8] A urethral stricture involves scarring that narrows the tube that carries urine out of your body; it restricts the flow of urine from the bladder and can cause a variety of medical problems in the urinary tract. *See Mayo Clinic Urethral Stricture*, https://www.mayoclinic.org/diseases-conditions/urethral-stricture/symptoms-causes/syc-20362330 (last visited Dec. 27, 2021).

On April 27, 2020, NP Thomas submitted a "routine" consult request for urology follow up as recommended by the specialist.  (Doc. 20-4 at 2.)  On May 22, 2020, the consult request was authorized.  (*Id.* at 2, 15.)

Meanwhile, around 11:30 p.m. on April 30, 2020, Shores reported to medical and saw a nurse.  He stated that he was unable to urinate, he could only dribble, and he wanted to be seen.  (*Id.* a 3.)  Shores' vitals were taken, and his weight was documented at 145 pounds.  (*Id.*)  Shores spoke with the nurse about getting catheterized, and the nurse informed him that if he was in great pain, an order for catheterization could be obtained from the provider.  (*Id.*)  Shores feared that catheterization would cause more damage, and wanted to see medical in the morning when the provider was available.  (*Id.*)  Shores was scheduled to be seen in the morning.  (*Id.* at 5.)

Shores reported to medical the next morning, May 1, 2020, around 9:00 a.m., and stated that he could not urinate.  It had been 16 hours since he last urinated.  (*Id.* at 7.)  The medical record state that Shores refused a straight catheter.  (*Id.* at 7, 9.)  But at that May 1, 2020 encounter, Nurse D. Griffin conducted a straight catheter (single use catheter that is then thrown away) and drained 420 cc of urine.  (Doc. 11 at 3.)  Shores was advised to return to medical that evening if he was still unable to pass urine.  (*Id.*)

Shores returned to medical at 6:00 p.m., still unable to pass urine.  (*Id.*)  Nurse Griffin submitted a request to NP Thomas to place a Foley catheter (an indwelling catheter that is left in place) on Shores.  (*Id.*)  NP Thomas denied the request for a Foley catheter and advised that Shores wait another 12 hours.  (*Id.* at 4.)  Nurse Griffin then consulted the Director of Nursing and was directed to call a different provider.  (*Id.*)  Nurse Griffin called NP Homestead.  She authorized a Foley catheter and it was placed.  (*Id.*)  Upon catheterization, approximately 900 cc of urine was drained from Shores' bladder.  (*Id.*)[9]

The next day, May 2, 2020, a nurse conducted a catheter check.  (Doc. 20-4 at 11.)

---

[9] Defendants did not provide the medical records documenting the May 1, 2020 morning straight catheter procedure or the evening placement of the Foley catheter.  (*See* Docs. 20, 100.)

Shores reported some discomfort at night, but his urine was clear and amber and the Foley catheter was secure. (*Id.*)

On June 1, 2020, an entry in the medical record regarding the urology appointment stated "service suspended see State of Arizona Executive Order 2020-10." (*Id.* at 16.)

On June 10, 2020, the urology appointment with Dr. Niemczyk was rescheduled for June 20, 2020. (*Id.* at 17.) By this time Shores had had the same Foley catheter for over a month, causing severe pain. (Doc. 11 at 4.)

On June 25, 2020, the appointment with Dr. Niemczyk was rescheduled to a date in July 2020. (Doc. 20-4 at 18.)

By mid-July 2020, Shores had not yet seen Dr. Niemczyk and he had incurred multiple severely painful infections caused by the catheter. (Doc. 22 at 4.) On July 14, 2020, Shores submitted an HNR stating that his catheter was not draining and his bladder felt full of urine after he drinks. (Doc. 33-1 at 1.)

On July 18, 2020, Shore saw Dr. Niemczyk for a transrectal ultrasound and examination. (Doc. 33-1 at 12.) The ultrasound showed no nodules. (*Id.* at 13.) Dr. Niemczyk ruled out urethral stricture and determined that acute prostatitis was unlikely. (*Id.*) Dr. Niemczyk assessed that Shores' sensation that there is an obstruction to his urine flow is most likely dysfunctional voiding, the cause of which may be elicited through urodynamics testing. (*Id.*) Dr. Niemczyk recommended that Shores be scheduled for the testing, and opined that Shores may benefit from a trial of diazepam or lorazepam to relax his pelvic muscles. (*Id.*) Dr. Niemczyk ordered a follow up in two weeks, and, on a separate Centurion form documenting the encounter, noted that the follow up was needed and urodynamics testing was "urgent so that pt. [patient] can be catheter free." (*Id.* at 10.)

On July 21, 2020, Shores saw NP Thomas for follow up to the urology appointment and in response to Shores' HNR about difficulty with the catheter draining. (*Id.* at 1.) NP Thomas noted that she could not locate the medical records from the July 18, 2020 appointment with Dr. Niemczyk. (*Id.*) NP Thomas wrote in the plan notes that as long as Shores could keep the bladder empty by forcing to void, she recommended that Shores

keep the same catheter until Shores saw the urologist again. (*Id.* at 4.) That same day, NP Thomas submitted an urgent consult request for a urology appointment "for possible UDS [urodynamics] as recommended by urology." (*Id.* at 6.)

On July 23, 2020, the urology consult request was authorized. (*Id.* at 7.) On July 29, 2020, the appointment with Dr. Niemczyk was scheduled for a date in August 2020. (*Id.* at 8.)

During the first two weeks in August 2020, Shores reported to officers and submitted HNRs stating that he was in severe pain and needed medical attention, but he was told to change his leg bag by himself and medical refused to see him until August 14, 2020. (Doc. 42 at 2.) By that time, Shores was in severe pain, had a 102-degree temperature, and was diagnosed with a severe urinary tract infection. (*Id.*) Shores was prescribed three different antibiotics, but his catheter was not changed. (*Id.* at 2–3.)

On August 16, 2020, Shores saw Dr. Niemczyk. (*Id.* at 3.)[10] The urodynamics testing could not be done due to the urinary tract infection. (*Id.* at 2–3.) Dr. Niemczyk changed the catheter and recommended that Shores return in two weeks for the testing. (*Id.* at 3.)

On September 1, 2020, Shores submitted an HNR stating that he saw urology on August 16, 2020, and the urologist made an urgent request that Shores return in two weeks. Shores requested he be sent to urology as soon as possible as he was in severe pain. (Doc. 58 at 6.) In response to the HNR, Shores saw NP Thomas on September 4, 2020. (Doc. 55-1 at 3; Doc. 100-1 at 2.) NP Thomas spoke to the clinical coordinator to expedite the urology consult, prescribed Lorazepam as a trial for dysfunctional voiding per the urologist's recommendation, and spoke to Shores about a plan to change the urobag monthly. (Doc. 100-1 at 5.)

Defendants proffer a Consultation Request Action form showing that a request for a urology consult was initially made on July 21, 2020. (*Id.* at 7.) A note on this form,

---

[10] Defendants did not submit the medical record from the August 16, 2020 encounter. (*See* Docs. 55, 100.)

dated September 8, 2020, states that the first available appointment with Dr. Niemczyk was September 26, 2020.  (*Id.*)

On September 13, 2020, Shores submitted an "urgent" HNR stating that the urologist requested Shores return for a two-week follow up and it had been four weeks since he saw the urologist.  (Doc. 58 at 3, 10.)  Shores requested that medical staff please stop delaying the specialist-recommended treatment.  (*Id.*)

On September 26, 2020, Shores saw Dr. Niemczyk.  (Doc. 100-3 at 53.)  The doctor took a patient history, performed a urodynamic study, and concluded that "the most desirable treatment would be pelvic floor physical therapy with biofeedback. Alternatively, an incision of the bladder neck could be performed."  (*Id.* at 53–54.)  Dr. Niemczyk recommended follow-up in two weeks to discuss the test results and schedule the surgical procedure.  (*Id.* at 54.)  On a Centurion form that Dr. Niemczyk filled out following this appointment, he wrote that the finding was voiding dysfunction, the diagnosis and prescription was "same," and that follow up included (1) pelvic floor physical therapy and (2) clean or sterile intermittent catheterization.  (Doc. 55-1 at 13.)

On September 29, 2020, Shores submitted an HNR stating that at 6:45 pm he was seen by a nurse due to his urine not flowing into the bag through the catheter.  (Doc. 100-2 at 15.)  Shores reported that he fell, and now his bladder was not draining and felt full. (*Id.*)  He wrote that this was causing severe pain and asked that this be checked out.  (*Id.*) The response, dated September 30, 2020, informed Shores that he was already placed on the provider line.  (*Id.*)

On October 2, 2020, NP Thomas submitted requested authorization for offsite pelvic floor physical therapy and biofeedback as recommended by the urologist.  (Doc. 100-1 at 29.)  The Condensed Consultation Action form shows that, on October 7, 2020, a physical therapy evaluation was authorized "through 1/02/2021."  (*Id.* at 30.)  But then, on October 9, 2020, the provider was asked to re-submit the consult request to see a pelvic floor physical therapist.  (*Id.* at 32.)  Additional Condensed Consultation Action forms show that "Medical necessity met," and the consult was authorized again on October 19,

2020.  (*Id.* at 33–34.)  On December 1, 2020, NP Thomas entered a note that they were unable to find a place for the required physical therapy treatment.  (*Id.* at 36.)

Meanwhile, on Wednesday, October 7, 2020, Shores submitted an "urgent" HNR stating that on Friday, he had to wait 9 hours between "cathing"; Saturday, he waited 16 hours; Monday, he waited 25 hours; Tuesday, he waited 23 hours; and Wednesday, he waited 13 hours.  (Doc. 100-2 at 16.)  Shores wrote that these long wait times caused him severe pain and more damage.  (*Id.*)  He asked if there was any way to get supplies for him to take to his cell.  (*Id.*)  The response, dated October 20, 2020, informed Shores that catheter supplies would be delivered.  (*Id.*)  Thereafter, Shores regularly picked up his self-catherization supplies from the health unit.  (*See id.* at 28.)

On October 20, 2020, Shores submitted an HNR stating that it had been over a month since the urologist-recommended physical therapy.  (*Id.* at 17.)  He requested that the urologist's recommendation be followed and the physical therapy be scheduled without further delay.  (*Id.*)

On October 22, 2020, Shores saw a different urologist, Dr. David Caropreso, via telemed.  (Doc. 100-3 at 55.)  Shores showed this new urologist the testing that Dr. Niemczyk had done and the test results, and this urologist agreed with Dr. Niemczyk's treatment plan.  (Doc. 71 at 2.)  In his medical note for this encounter, Dr. Caropreso recommended a continuation of clean intermittent catheterization 3-4 times per day, noted that he needed the prior urodynamic study to make further recommendations, and stated that prison officials otherwise should "follow prior urologist recommendations." (Doc. 100-3 at 55–56.)

On October 26, 2020, NP Thomas submitted a consult request seeking authorization for a 2-week urology follow up.  (Doc. 100-1 at 67.)  The request asked to include copies of all records from Dr. Niemczyk's visit.  (*Id.*)  Authorization was obtained on November 18, 2020.  (*Id.* at 67, 69.)

On November 4, 2020, Shores saw NP Thomas for follow up after the urology consult.  (Doc. 100-2 at 18.)  Shores reported that he still cannot urinate and is doing

straight catheters 2-3 times per day.  (*Id.*)  NP Thomas noted that the urologist advised to continue using the straight catheter as needed, that Shores was willing to return to urology for possible bladder neck incision, and that Shores was waiting for pelvic floor physical therapy.  (*Id.* at 18–19.)

On November 10, 2020, Shores was seen by a nurse and reported that he was unable to empty his bladder with the straight catheter after attempting to do so multiple times.  He complained of pressure and pulsating.  (*Id.* at 20.)  In the health unit, a Foley catheter was inserted to assess for retention, a scant amount of urine return was noted, and the Foley catheter was removed.  (*Id.*)  Shores was advised not to use the straight catheter too frequently.  (*Id.*)

On November 14, 2020, Shores saw NP Igwe and reported difficulty inserting the straight catheter and he stated that the straight catheter is not helping because the scarring in his bladder made it difficult for him to have intermittent straight catheterization multiple times a day.  (*Id.* at 30.)  He requested to have a Foley catheter placed until his follow up with urology.  (*Id.*)  The plan was to place a Foley catheter pending urology consult and bladder physical therapy.  (*Id.* at 31.)  A Foley catheter was not placed at the time, and Shores continued to receive self-catheterization supplies.  (*Id.* at 28, 32, 34, 36, 45; Doc. 100-3 at 8, 20, 35.)

On December 22, 2020, Dr. Rodney Stewart submitted a consultation request seeking authorization for pelvic floor physical therapy as previously recommended by the urologist.  (Doc. 100-1 at 37.)  On December 28, 2020, authorization was obtained and a consult was scheduled.  (*Id.* at 37–39.)

On January 12, 2021, Shores was sent to another urologist at Valleywise Health Medical Center.  (Doc. 71 at 2.)[11]  Shores alleges that, at Centurion's request, this new,

---

[11] Defendants did not submit any medical records from this January 12, 2021 encounter, and the urologist that Shores saw is not identified.  (*See* Doc. 100-2 at 2.) Defendants proffered only a single-page Centurion form indicating a date of service of "1/12/2021" at "Valleywise Urology Clinic," and including a note in the "follow up" section of the form stating "will contact to schedule cystoscopy."  (Doc. 100-2 at 2.)  But this is the only section of the form that is filled out; there is no review of the case or

1   unidentified urologist recommended redoing all the testing that Dr. Niemczyk had
2   previously completed.  (*Id.*)

3       On January 14, 2021, NP Thomas submitted a consult request seeking authorization
4   for a cystoscopy.  (*Id.* at 3.)  On January 19, 2021, the request for a cystoscopy was
5   authorized.  (*Id.* at 5, 7.)  A note entered on January 20, 2021 stated that Valleywise was
6   emailed to set a date for the cystoscopy, but all surgeries were on hold due to COVID.  (*Id.*
7   at 6.)

8       On January 22, 2021, Shores had a physical therapy consult at Bodycentral Physical
9   Therapy in Tucson, Arizona.  (Doc. 100-1 at 40.)  The physical therapist, Yeri Kil,
10  conducted a thorough physical examination and patient history and noted that Shores had
11  pelvic pain, hypertonic pelvic floor muscles, significant difficulty voiding his bladder, and
12  relies on a catheter 100% of the time.  (*Id.* at 43–45, 50–54.)  Kil advised that Shores would
13  "benefit from skilled physical therapy interventions to address physical impairment,
14  functional limitation, and participation restrictions in order to improve the quality of life."
15  (*Id.* at 41, 45.)  Kil recommended a treatment plan of physical therapy once a week for 12
16  weeks.  (*Id.* at 46.)

17      On January 30, 2021, Shores submitted an HNR asking about the status of physical
18  therapy that had been recommended back in September 2020.  (*Id.* at 49.)  He asked that
19  the physical therapy be scheduled without further delay.  (*Id.*)

20      On February 3, 2021, Shores submitted an HNR reporting that he started noticing
21  blood in his urine during catherization and asked to be seen on the nurse line.  (*Id.* at 50.)
22  On February 7, 2021, Shores saw a nurse, who noted that blood in Shore's urine usually
23  occurred when he had to be more aggressive with insertion of the catheter due to "scar
24  tissue."  (Doc. 100-3 at 2.)

25
26
27

28  _____

diagnosis, the practitioner's name is not listed in the designated space, and the practitioner
did not sign or date the form.  (*See id.*)

On February 16, 2021, Shores submitted an HNR asking about the status of physical therapy and whether it had been approved or scheduled. (*Id.* at 10.) The response, dated February 17, 2021, informed Shores that it was not yet approved. (*Id.*)

On February 24, 2021, Shores filed a Motion for Preliminary Injunction asserting that Defendants had not approved physical therapy as recommended by the treating specialists. (Doc. 71.)

On February 25, 2021, Shores saw NP Thomas about the blood in his urine and occasional dysuria (pain or burning when urinating). (*Id.* at 18.) NP Thomas assessed possible microtrauma during self-catherization and ordered a urinalysis. (*Id.* at 19.) NP Thomas advised Shores to use lubrication jelly and self-catharize gently to avoid trauma. (*Id.*)

Also on February 25, 2021, NP Thomas submitted a consult request for 12 weeks of pelvic floor physical therapy as recommended during the consult. (Doc. 100-2 at 9.) On March 8, 2021, Centurion denied the physical therapy consult request and, instead, issued an alternative treatment plan (ATP). Documentation said the "request for additional PT visits has been ATP'd per MD . . stated 'patient can have some home program developed.'" (Doc. 100-1 at 63–64.) On March 9, 2021, NP Thomas "accepted" the ATP. (*Id.* at 65.)

On March 2, 2021, a note was entered stating that Valleywise is not scheduling surgeries, and a request was sent to Dr. Caropreso's scheduler to see if his office would schedule a cystoscopy. (Doc. 100-2 at 10.) An appointment was scheduled with Dr. Caropreso for March 13, 2021. (*Id.* at 11.)

On March 12, 2021, Shores saw NP Thomas, who advised Shores that pelvic floor physical therapy was denied by Centurion's Dr. Young. (*Id.* at 26; Doc. 93 at 1.) During this March 12 encounter, Dr. Stewart came into the room and reviewed the January 22, 2021 recommendation from Bodycentral Physical Therapy, which was for 12 weeks of physical therapy, to include various types of therapy that cannot be done at the prison. (Doc. 93 at 2.) Dr. Stewart advised that he would appeal Dr. Young's denial. (*Id.*; Doc. 100-3 at 27.)

On March 13, 2021, Shores had a cystoscopy procedure at Arizona Urology. (Doc. 100-2 at 12.)[12]  On the single-page Centurion form filled out by the practitioner, Dr. Caropreso wrote that the cystoscopy was normal, but that follow up was needed – namely, physical therapy with biofeedback as previously recommended.  (*Id.*)

On March 15, 2021, Shores submitted an HNR to Dr. Stewart informing him that at the March 13, 2021 urologist visit the specialist recommended pelvic floor physical therapy.  Shores asked Dr. Stewart to proceed with the appeal.  (*Id.* at 30.)

On March 17, 2021, Shores saw NP Thomas for follow up to the March 13, 2021 urology visit.  (*Id.* at 33.)  NP Thomas noted that she discussed Shores' options with Dr. Young, but Dr. Young stated he will not approve pelvic floor physical therapy or biofeedback.  (*Id.* at 34.)  Shores was informed that Centurion would not approve outside pelvic floor physical therapy and was given a handout for pelvic floor exercises and told he would have to continue to use a straight catheter until he is released from prison.  (*Id.*; Doc. 93 at 2.)

On April 28, 2021, the Court issued an Order to Show Cause in response to Shores' Motion for Preliminary Injunction.  (Doc. 98.)  The Court found that Shores demonstrated serious questions going to the merits of his claim and that absent an injunction, he would be exposed to irreparable harm.  (*Id.* at 8–10.)  Before issuing an injunction, the Court ordered Defendants to submit specific medical records of Shores' treatment.  (*Id.* at 12.)

The next day, April 29, 2021, Dr. Stewart submitted an urgent consult request for a 12-week program of pelvic floor physical therapy as recommended by urology.  (Doc. 100-3 at 46.)  On May 4, 2021, the consult request for 12 weeks of physical therapy was authorized.  (*Id.* at 46, 50.)

On May 5, 2021, a note was entered indicating that Shores had been discharged from Bodycentral's system and needed to be re-evaluated.  (*Id.* at 51–52.)  Therefore, on

---

[12] Defendants did not submit he medical record from the March 13, 2021 encounter. (*See* Doc. 100.)

1  May 7, 2021, Dr. Stewart submitted a consult request for an initial evaluation for pelvic

2  floor physical therapy.  (*Id.* at 57.)

3         Shores began physical therapy sessions on June 14, 2021, and attended his 12th

4  physical therapy session on October 1, 2021.  (Doc. 134 at 2; Doc. 137 at 1; Doc. 140-1 at

5  9.)[13]  At the October 1 appointment, the physical therapist recommended 4 follow-up visits.

6  (Doc. 137 at 1; Doc. 140-1 at 9.)

7         On October 13, 2021, Shores saw NP Thomas, who informed Shores that the

8  therapist's recommendation for 4 follow-up visits was denied by Dr. Young.  (Doc. 137 at

9  2.)

10         On October 14, 2021, NP Thomas submitted a consult request for an urgent urology

11  consult.  (Doc. 140-2 at 2.)  On October 20, the consult request was authorized.  (*Id.*)

12         On November 10, 2021, Shores met with urologist Dr. David Caropreso via telemed

13  and Dr. Caropreso recommended that Centurion follow the physical therapist's

14  recommendation for further pelvic floor therapy.  (Doc. 141 at 2.)  Dr. Caropreso also

15  recommended that Shores be sent to the urologist's office for further testing.  (*Id.* at 3–4.)

16  **IV.   Eighth Amendment**

17         To support a medical care claim under the Eighth Amendment, a prisoner must

18  demonstrate "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d

19  1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are

20  two prongs to the deliberate-indifference analysis: an objective standard and a subjective

21  standard.  First, a prisoner must show a "serious medical need."  *Id.* (citations omitted).  A

22  "'serious' medical need exists if the failure to treat a prisoner's condition could result in

23  further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin*,

24  974 F.2d at 1059–60 (internal citation omitted).  Examples include "[t]he existence of an

25  injury that a reasonable doctor or patient would find important and worthy of comment or

26  _____

27         [13] On August 10, 2021, the Court issued an Order discharging the prior Order to
Show Cause and holding Shores' Motion for Preliminary Injunction (Doc. 71) in abeyance
28  until confirmation was received showing that Shores received all 12 physical therapy
sessions.  (Doc. 133.)

treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

Even if deliberate indifference is shown, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

## V.    NP Thomas

### A.    Serious Medical Need

Defendants do not dispute that Shores' condition constituted a serious medical need. (*See* Doc. 99.) Shores' allegations and medical records show that his prostate pain and symptoms, which require use of a catheter, were and continue to be worthy of comment and treatment and, absent treatment, could result in significant injury or unnecessary pain. *See McGuckin*, 974 at 1059–60. The Court has already found that Shores met this first prong in the deliberate indifferent analysis. (*See* Doc. 39 at 10.)

### B.    Deliberate Indifference

Defendants argue that Shores cannot demonstrate deliberate indifference by NP Thomas. (Doc. 99 at 12.) They contend that NP Thomas has exercised and continues to exercise the appropriate level of care based on Shores' condition and medical necessity,

that Shores simply disagrees with medical providers and specialists, and that any delays in treatment were due to the pandemic and outside of NP Thomas' control. (*Id.* at 8, 12–13.)

The medical records show that Dr. Thompson ordered an endorectal ultrasound in September 2018, and a urology consult in October 2018, and, when she first saw Shores on August 26, 2019 she was aware of Dr. Thompson's orders and Shores' worsening symptoms. (Docs. 22 at 6–7, 11; Doc. 20-2 at 2.) Although NP Thomas submitted a consult request for the endorectal ultrasound that same day, the procedure was not done. Thereafter, in October 2019, NP Thomas saw Shores and was aware that the procedure was not done, but she took no action to ensure that the ultrasound got scheduled. (Doc. 20-2 at 7–8.) The record shows that in early December 2019, there was communication with staff about trying to schedule the endorectal ultrasound, but there is no evidence that NP Thomas ever followed up, even after a third letter from a Prison Law Office attorney was sent in mid-December about the delay. (Doc. 11 at 2; Doc. 22 at 17–19.)

In January 2020, NP Thomas saw Shores and noted that the endorectal ultrasound had not been done, and, for the first time, she submitted a consult request for urology. (Doc. 20-2 at 9, 13.) When Shores finally saw urologist Dr. Niemcyzk on April 25, 2020, he ordered that Shores return for follow up in two weeks and receive the endorectal ultrasound. (Doc. 11 at 3; Doc. 20-3 at 6–7.) On April 27, 2020, NP Thomas, submitted a consult request for the endorectal ultrasound, but the request was for a "routine"—not "urgent"—off-site procedure. (Doc. 20-4 at 2.) Shores did not return to the urologist for the endorectal ultrasound until July 18, 2020—11 months after NP Thomas initially ordered the endorectal ultrasound pursuant to Dr. Thompson's order and almost 3 months after Dr. Niemcyzk ordered a 2-week follow up for the ultrasound. (Doc. 33-1 at 12.)

A reasonable jury could find that NP Thomas did not exercise the appropriate level of care based on Shores' condition and the medical necessity for an endorectal ultrasound and a urology consult.

The record supports that there were other instances of a failure to timely provide necessary care. In May 2020, NP Thomas refused to authorize a Foley catheter when

Shores had been unable to pass urine all day and, as he explained, "was full of urine and [could] not wait . . . even one more hour." (Doc. 11 at 3–4.) When NP Thomas advised that Shores wait another 12 hours before placing a Foley catheter, nursing staff contacted another provider to obtain authorization and place the catheter, which resulted in 900 cc of urine being drained from Shores' bladder. (*Id.* at 3–4.)[14] Defendants provide no explanation for NP Thomas' failure to respond to Shores' medical need on this occasion.

Nor do Defendants provide any plausible explanation for NP Thomas' failure to timely follow the specialists' and physical therapist's recommendations for pelvic floor physical therapy. The medical records show that urologist Dr. Niemczyk recommended physical therapy in September 2020; physical therapist Kil recommended a 12-week course of physical therapy in January 2021; and urologist Dr. Caropreso recommended physical therapy in March 2021. (Doc. 100-3 at 53–54; Doc. 100-1 at 13, 46; Doc. 100-2 at 12.)[15] These three specialists all personally examined Shores, took medical histories, and ran relevant tests before making their treatment recommendations. (*See id.*) In March 2021, when Centurion denied the consult request for 12 weeks of physical therapy, NP Thomas accepted the denial and the ATP. (Doc. 100-1 at 63–65.) Defendants did not offer any evidence regarding the consult request process, but because there is specific documentation that this decision was "accepted" by the provider, the inference can be made that NP Thomas could have rejected the ATP but chose not to.

---

[14] According to the National Library of Medicine, a healthy bladder can hold up to 16 ounces of urine comfortably for 2–5 hours. (16 ounces = approximately 474 cc.) *See Nat'l Library of Medicine, Urine and Urination*, https://medlineplus.gov/urineandurination.html (last visited Dec. 22, 2021).

[15] Defendants assert that on September 26, 2020, Dr. Niemczyk noted that Shores "just needed to do pelvic floor exercises," and they state that upon Shores' return to the prison Centurion staff noted that there was no indication of any further follow-up needed in the note. (Doc. 99 at 6; Doc. 100 30.) Defendants misstate the medical records. Dr. Niemczyk wrote that needed follow up included "(1) pelvic floor physical therapy[;] (2) clean or sterile intermittent catheterization" (Doc. 100-1 at 13). And upon Shores' return to the prison, Centurion staff specifically documented in the medical record that the treatment plan included "pelvic floor physical therapy" and "clean or sterile intermittent catheterization." (*Id.* at 18).

The Ninth Circuit and other courts have routinely found that failure to follow a treating specialist's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell*, 763 F.3d at 1069 (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (in granting a preliminary injunction for specialist treatment, the district court found that the prisoner plaintiff showed a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation). A reasonable jury could find that NP Thomas' failure to follow the specialists' recommendations for physical therapy led to a delay in obtaining the needed treatment and exhibited deliberate indifference.

Contrary to Defendants' contention that he simply disagrees with medical providers, Shores actually agreed with all the treating specialists' recommendations for an endorectal ultrasound, urology consults and follow up appointments, and pelvic floor physical therapy. (Doc. 111 at 17; *see* Doc. 20-2 at 9, 13; Doc. 20-4 at 2; Doc. 22 at 6–7, 11; Doc. 100-1 at 65.) But there have been delays in providing all these treatments since NP Thomas became Shores' treating provider in 2019.

Defendants' argument that any delays in treatment were due to the pandemic and outside of NP Thomas' control was previously rejected by the Court as inaccurate. (Doc. 39 at 11.) The State's Executive Order halting nonessential procedures was issued

1    on March 19, 2020 and lifted on April 22, 2020, allowing such procedures to resume

2    May 1, 2020.  (*Id.*)[16]   Thus, the pandemic-related Executive Orders affecting medical

3    offices do not account for the delays in treatment in 2019 and early 2020, nor do they

4    excuse the failure to timely provide the follow up ordered at the April 25, 2020 urology

5    appointment or the failure timely to provide the recommended physical therapy in late 2020

6    and into 2021.

7          This case presents genuine issues of material fact as to whether NP Thomas acted

8    with deliberate indifference when she repeatedly failed to ensure timely specialist-

9    recommended treatment for Shores' serious medical needs.

10         **C.    Resulting Harm**

11         Defendants contend that Shores has not suffered any injury attributable to

12   Defendants.  (Doc. 99 at 14.)  They submit that there is no expert testimony to establish an

13   injury resulting from Defendants' care, that there was no evidence of chemotherapy or

14   radiation treatment recommendations and no suggestion of cancer, and that there is "no

15   evidence of anything other than a problem voiding, which is being addressed."  (*Id.* at 3,

16   14.)

17         Shores is not required to submit expert testimony to support his § 1983 deliberate

18   indifference claim.   Because the "deliberate indifference component of the Eighth

19   Amendment inquiry is subjective . . . expert testimony is not required to determine whether

20   Defendants acted with deliberate indifference."  *O'Neill v. Bannister*, No. 3:12-cv-00030-

21   LRH (WGC), 2012 WL 12542743, at *2 (D. Nev. Aug. 29, 2012) (citing *Farmer*, 511 U.S.

22   at 834).; *accord  Ledford v. Sullivan*, 105 F.3d 354, 359 (7th Cir. 1997) (recognizing that

23   deliberate indifference claims are based upon a subjective state of mind, and thus normally

24   do not require the kind of objective, expert testimony required in a malpractice action);

25   *Pruitt v. Ryan*, No. CV-13-02357-PHX-DJH (ESW), 2016 WL 1376444, at *4 D. Ariz.

26

27   _____

28        [16] *See State of Arizona Executive Orders 2020-10 & 2020-32*, April 22, 2020,
     https://azgovernor.gov/sites/default/files/eo_2020-10.pdf,   and   https://azgovernor.gov/
     sites/default/files/eo_2020-32_elective_surgeries.pdf (last visited Dec. 21, 2021).

Apr. 7, 2016) ("[a] trier-of-fact does not require a medical expert to determine whether Defendants were deliberately indifferent to Plaintiff's medical needs").

Defendants' assertion that there was never any suggestion of cancer or related treatments is belied by the medical evidence. Shores offered medical records from his September 2018 encounter with Dr. Thompson, including the Offsite Services Referral Request in which Dr. Thompson documented a prostate nodule, the need for an endorectal ultrasound, and treatment to include "radiology" and "chemotherapy." (Doc. 22 at 6–7.) In the August 19, 2019 medical record, NP Thomas assessed "possible BPH prostate cancer/epidydimal cyst/testicular cancer." (Doc. 20-2 at 2.) And on January 24, 2020, NP Thomas again assessed "possible prostate cancer." (*Id.* at 9.) Thus, Shores' symptoms were significant enough for Dr. Thompson and even NP Thomas herself to suspect possible cancer. The medical records support that cancer, urethra stricture, and acute prostatitis were ruled out only after the July 2020 urology visit and endorectal ultrasound, at which time the treating urologist was able to make a diagnosis of dysfunctional voiding and appropriate testing and treatment regimens could be attempted. (*See* Doc. 20-3 at 6; Doc. 33-1 at 12–13.)

As just discussed, there is a question of fact as to whether NP Thomas repeatedly failed to ensure timely treatment for Shores' serious medical need. Thus, there is a question of fact whether, had NP Thomas ensured an endorectal ultrasound and specialist care earlier, and had she not "accepted" an ATP in lieu of physical therapy, Shores would have received a proper diagnosis sooner and would have started specialist-recommended treatment sooner. During the ensuing delays, Shores suffered—and he continues to suffer—severe pain, worsening symptoms, and increased difficulty urinating, and he ultimately required a catheter which in turn causes pain and other difficulties. (*See* Doc. 11 at 4; Doc. 20-2 at 12–13; Doc. 20-4 at 3, 7; Doc. 33-1 at 1; Doc. 111 at 6, 18.) This harm is sufficient to support an Eighth Amendment claim. *See Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose");

*McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action).

For the above reasons, summary judgment will be denied as to the claim against NP Thomas.

## VI.    Centurion

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law).    Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury.  *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

### A.    Constitutional Injury

Defendants contend that there is no evidence Shores has been denied appropriate medical care, that any delays were due to the wait for a cystoscopy and the COVID-19 pandemic, that Shores merely disagrees with his providers' course of treatment, and that Shores did not suffer injury attributable to Defendants.  (Doc. 99 at 5, 7, 12–14.)

As stated above, failure to follow a treating specialist's recommendations and delaying medical treatment may constitute deliberate indifference. *See Colwell*, 763 F.3d at 1069; *Snow*, 681 F.3d at 988; *Wood*, 900 F.2d 1332, 1334.  The evidence shows failures to timely comply with specialist-recommended treatment and significant delays in care.

When Shores was first seen by Centurion staff in August 2019, there were orders from the prior treating physician for Shores to receive an endorectal ultrasound, or

alternatively to have a urology consult.  (Doc. 22 at 6–7, 11; Doc. 20-2 at 2–3.)  A consult request for the ultrasound was submitted after the August 19, 2019 encounter, but Shores did not receive the ultrasound until July 18, 2020—an 11-month delay.  (Doc. 33-1 at 12.)  A consult request for Shores to see a urologist was not submitted until January 24, 2020, and Shores did not see Dr. Niemczyk until April 25, 2020—8 months after the August 2019 encounter and 3 months after the consult request was finally submitted.  (Doc. 20-2 at 10; Doc. 20-3 at 3.)  Thereafter, Dr. Niemczyk sought a 2-week follow up, yet Shores was not returned to Dr. Niemczyk until July 18, 2020—a 3-month delay.  (Doc. 111 at 6; Doc. 33-1 at 12.)  Although Dr. Niemcyzk recommended a follow up 2 weeks following the July 18, 2020 appointment, Shores did not see him again until September 26, 2020—a 2-month delay.  (Doc. 111 at 10, 41.)  At that September 26, 2020 appointment, Dr. Niemcyzk again recommend that Shores return in 2 weeks.  (*Id.* at 43–44.)  But all further appointments with Dr. Niemcyzk were cancelled and Shores did not see another urologist for 4 weeks.  (*Id.* at 10; Doc. 100-3 at 55–56.)  During all of these delays Shores was suffering from significant pain and urinary complications.

Dr. Niemcyzk first recommended pelvic floor physical therapy at the September 26, 2020 encounter.  (Doc. 100-3 at 53–54.)  Even though another urologist and a physical therapist also recommended pelvic floor physical therapy thereafter, Shores did not start physical therapy sessions until June 2021—a 9-month delay.  (Doc. 134 at 2: Doc. 140-1 at 9.)  In their Motion, Defendants suggest that the delay in physical therapy occurred because one unidentified urologist "indicated" that a cystoscopy "could be done instead of physical therapy," thereby justifying the wait until the March 13, 2021 cystoscopy was completed.  (Doc. 99 at 7, 12.)  In their Reply, Defendants assert that the unidentified urologist determined to first try the cystoscopy procedure before going ahead with pelvic floor physical therapy.  (Doc. 123 at 3.)  The cystoscopy was purportedly recommended at a January 12, 2021 appointment, when Defendants inexplicably took Shores to a different urologist and asked that urologist to reorder numerous tests Dr. Niemcyzk had already conducted.  (Doc. 71 at 2; Doc. 100-2 at 2.)  As mentioned, Defendants did not submit any

medical records from the January 12, 2021 encounter.  Thus, there is no evidence that this urologist—or any other specialist—ever recommended that a cystoscopy could be done instead of physical therapy, or that a cystoscopy needed to be done before going ahead with the physical therapy.

In addition, the evidence shows that NP Thomas submitted a consult request for physical therapy on February 25, 2021 – before the cystoscopy was performed – further supporting that there was no directive from a specialist to wait until a cystoscopy was done before proceeding with physical therapy.  (Doc. 100-2 at 9.)  And Centurion's March 8, 2021 denial of the physical therapy consult request made no mention of a need to wait for a cystoscopy.  The denial was based solely on the determination that Shores could do some sort of "home program."  (Doc. 100-1 at 63–64.)

As discussed above, Defendants' arguments that delays in care were caused by the pandemic and that Shores merely disagrees with his providers are unsupported and insufficient to preclude a finding of deliberate indifference.

In addition to delays in treatment, the evidence also shows that Centurion staff repeatedly failed to adequately address Shores' catheter needs.  After a Foley catheter was placed in May 2020, Shores went months before it was changed, which resulted in severe pain and several serious urinary tract infections.  (Doc. 11 at 4; Doc. 22 at 4; Doc. 42 at 2–3.)  Shores submitted HNRs complaining of problems with catheters, severe pain, and blood in the urine bag.  (Doc. 33-1 at 1; Doc. 42 at 2; 100-1 at 50.)  Centurion staff often failed to see Shores in response to his HNRs or told him to change the leg bag himself.  (*See id.*)  The record supports that, during the 5 months Shores had an indwelling catheter, Centurion staff changed his leg bag only twice.  (Doc. 111 at 11; Doc. 100 ¶ 31.)  In October 2020, Shores submitted an HNR detailing the long delays between straight catherization – from 9 hours to as much as 25 hours at times – and that these delays caused severe pain and damage.  (Doc. 100-2 at 16.)  Urologist Dr. Caropreso stated that intermittent catheterization should be done 3–4 times per day.  (Doc. 100-3 at 55–56.)

1    The ongoing failure to properly change Shores' catheter and address his catheter

2    needs strongly suggests that medical staff acted with deliberate indifference to Shores'

3    medical needs, and a reasonable jury could find that Shores suffered harm as a result.  *See*

4    *McGuckin*, 974 F.2d at 1060–61 ("a finding that the defendant repeatedly failed to treat an

5    inmate properly . . . strongly suggests that the defendant's actions were motivated by

6    'deliberate indifference' to the prisoner's medical needs"); *Wood*, 900 F.2d at 1334 ("[i]n

7    determining deliberate indifference, we scrutinize the particular facts and look for

8    substantial indifference in the individual case, indicating more than mere negligence or

9    isolated occurrences of neglect"); *see also Newell v. Ngu*, 589 F. App'x 782 (7th Cir. 2014)

10   (the plaintiff's testimony that he suffered from recurring urinary tract infections and

11   experienced pain and discomfort during the extended period that his catheter was not being

12   changed properly was sufficient for a jury to infer that the infections and pain resulted from

13   the lack of appropriate attention to his catheter).

14       Whether Shores suffered a constitutional injury is a question of fact that must be

15   resolved by a jury.

16       **B.    Policy or Custom**

17       A policy is "a deliberate choice to follow a course of action" made by the officials

18   or entity "responsible for establishing final policy with respect to the subject matter in

19   question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  A policy can be one of

20   action or inaction. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).  A "custom"

21   for purposes of municipal liability is a "widespread practice that, although not authorized

22   by written law or express municipal policy, is so permanent and well-settled as to constitute

23   a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

24   "Liability for improper custom may not be predicated on isolated or sporadic incidents; it

25   must be founded upon practices of sufficient duration, frequency and consistency that the

26   conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99

27   F.3d 911, 918 (9th Cir. 1996).  While one or two incidents are insufficient to establish a

28   custom or practice, the Ninth Circuit has not established what number of similar incidents

would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at \*2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478). But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Id.* Whether actions by entity officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct." *Mi Pueblo San Jose, Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL 2850016, at \*4 (N.D. Cal. Oct. 4, 2006).

Defendants argue that Shores cannot show any policy or custom to consciously disregard a serious medical need. (Doc. 99 at 16.) But the medical evidence shows multiple delays in specialist-recommended treatment—for an endorectal ultrasound, for an initial urology consult, for numerous follow-up urology consults, and for physical therapy—since August 2019. The evidence also supports ongoing failures to timely change Shores' catheter and address his catheter needs. A reasonable jury could find that multiple instances of treatment delays and failure to adequately treat Shores over a 2-year period amount to a custom or practice of deliberate indifference.

Further, the record supports that these delays and the failures did not result from the actions of one or two rogue employees. They occurred over time and involved numerous Centurion employees. *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997) (finding a policy more likely where multiple employees were involved in the constitutional violation). On this record, a reasonable jury could conclude that medical staff were acting pursuant to Centurion policy or custom. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194–95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question).

## C.    Deliberately Indifferent Policy/Moving Force

Because deliberate indifference is exhibited where prison officials deny or delay

medical treatment and harm results, *see Wood*, 900 F.2d at 1334, an ongoing policy or practice that denies or delays specialist-recommended treatment for a serious medical need and thereby causes harm would constitute a deliberately indifferent policy.

To establish that a policy or custom is the "moving force" behind a constitutional violation, a plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). The Court has already found a genuine issue of material fact as to whether there existed a policy or custom of delaying specialist-recommended treatment and a policy or custom of failing to address catheter needs. An obvious consequence of such policies or customs may be the denial and delay of constitutionally adequate medical care. On this basis alone, the moving-force element is satisfied. *See Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by the [entity] . . . itself violates federal law will also determine that the [entity] action was the moving force behind the injury of which the plaintiff complains").

Questions of fact exist as to whether Centurion had or still has a deliberately indifferent policy that deprived Shores of his constitutional rights.

**VII. Injunctive Relief**

Defendants argue that Shores' claim for injunctive relief is moot because he does not need to be sent to a cancer specialist, as he requested in his amended pleading, and he has been sent to a urologist and is being provided treatment. (Doc. 99 at 15.) Defendants assert that there is no indication Centurion will discontinue any medically necessary treatment and any speculation that issues may arise in the future does not support a claim. (*Id.*)

Where a plaintiff seeks injunctive relief, a court may consider developments that postdate the pleadings. *Farmer*, 511 U.S. at 846. Indeed, it is a defendant's current conduct that determines whether injunctive relief is warranted. *Id.* at 845–46. As a result, Shores' request for injunctive relief is not limited to a request to see a cancer specialist, which he made in his pleading because cancer had not yet been ruled out as a possible diagnosis.

Throughout this litigation, Shores has moved for injunctive relief in the form of treatment recommended by urologists and the Court has entertained his motions because they directly relate to Shores' deliberate indifference claim.  Shores now alleges that, in October 2021, the physical therapist recommended 4 follow-up visits, and that, in November 2021, Dr. Caropreso recommended further pelvic floor physical therapy as well as an in-person urology visit for further testing.  But Centurion has denied further physical therapy and there is no evidence that an appointment with Dr. Caropreso is pending.  (Doc. 137 at 1–2; Doc. 140-1 at 9.)   Shores' claim that Defendants will not provide specialist-recommended treatment is not speculative, and there is a question of fact whether Centurion is currently providing constitutionally adequate medical care for Shores' serious medical need.

**VIII.  Punitive Damages**

Defendants argue that the Court should enter summary judgment on Shores' claim for punitive damages on the ground that the circumstances do not warrant imposition of such damages.  (Doc. 99 at 16.)

A request for punitive damages is not a separate claim, but rather a request for a particular relief as to Shores' constitutional claims.  Whether punitive damages are warranted is an issue reserved for the jury.  *See Pacific Mut. Life Ins. Co. v. Haslip*, 111 U.S. 1, 16 (1991) (noting that, with respect to punitive damages, "[t]his has been always left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case") (quotation omitted); *Smith v. Wade*, 461 U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion").  A jury may assess punitive damages in a § 1983 action when a defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith*, 461 U.S. at 56.

A reasonable jury could conclude that conduct by NP Thomas and Centurion medical staff involved a "reckless or callous indifference to the federally protected rights

of" Shores, thereby warranting punitive damages. *Id.* The request for summary judgment as to punitive damages will therefore be denied.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 99), and the Motion is **denied**.

(2)    This action is referred to Magistrate Judge Michael T. Morrissey to conduct a settlement conference on the remaining claims.

(3)    Defense counsel must arrange for the relevant parties to jointly call Magistrate Judge Morrissey's chambers at (602) 322-7680 within 14 days to schedule a date for the settlement conference.

Dated this 5th day of January, 2022.

David G. Campbell
Senior United States District Judge